HAWKINS, Justice
for the Court.
Bob Burnham Pontiac Toyota, Inc., an automobile dealership, obtained a judgment against Universal Underwriters Insurance Company in the Circuit Court of Jackson County for $10,000 actual damages and $35,000 punitive damages under an insurance policy covering losses caused by dishonest or fraudulent acts of employees. Universal appeals. We reverse and remand.
The issues we address on this appeal are:
(1) Whether the circuit judge erred in instructing the jury that, as a matter of law, employees of the plaintiff had committed dishonest acts, and that plaintiff had sustained damages thereby; and
(2) What the measure of damages recoverable under a fidelity insurance policy should be when the dishonest act of an *1011 employee results in a claim for damages by a third party against the employer.
In March, 1977, Marvin R. Dean, Jr., commonly known as “Buddy” Dean, went to Burnham’s place of business and traded a 1975 Ford pickup for a 1976 GMC truck. Mel Hannemann, a salesman for Burnham, handled the transaction.
A credit union of Continental Can Company was lienholder for $1,934.09 owed it on the vehicle at the time, and held the original title in its possession as such lienholder. To effect transfer of title and release of the lien, it was necessary for the credit union to release its lien. To accomplish this, Burn-ham prepared a bank draft on itself, in envelope form and in accordance with its customary procedure, which in effect informed the credit union that upon presentation of the draft to a local bank, with all requisite title documents enclosed therein, including a release of its lien, it would be paid $1,934.09.
At the conclusion of the notation on the face of the draft was a place for the customer to sign authorizing the release of the papers. The notification (printed in red) on the draft in this case was as follows:
Net payoff quoted by you (please telephone us if incorrect) for: 1975 Ford Floo (P234A) F10YNW83318 Year Make Model Serial Number (our Stock No.) After you have inserted into the draft envelope all papers including released title, please deposit in routine banking channels. We will pay it when presented after verifying contents. Okay to forward this dealer all papers requested in paying off my account:
Customer (signed) Marvin R. Dean, Sr.
(typed) Marvin R. Dean, Sr.
Hannemann signed the name of Marvin R. Dean, Sr., on the draft.
The 1975 Ford truck had been purchased by Marvin R. Dean, Sr., as a present for his son Buddy, but the title was in the name of Dean, Sr., and the financing in his name.
Burnham had purchased the GMC truck from Jeffcoat Motors, another local dealer. The GMC was not new but in ordinary circumstances would still have been under the 12,000 mile new vehicle warranty when Buddy purchased it. A few days after purchasing the GMC Buddy noticed something was wrong with its air conditioning system, and Burnham told him to take it to the GMC dealer in Pascagoula to have it repaired under warranty. The GMC dealer informed Buddy the truck had been wrecked and was therefore excluded from warranty. Buddy then returned the truck to Burnham, and requested the return of the 1975 Ford truck and rescission of the trade. Burnham agreed to perform any work the manufacturer would perform under a 12,000 mile warranty, which satisfied Buddy, and he kept the truck. For the next few months Burnham made periodic repairs to the GMC, and Buddy remained satisfied.
Buddy installed a butane system in the GMC, and several months later it caught fire. The burned GMC was returned to Burnham, who later sold it for $2,500.00.
Several months after the purchase, and probably after the GMC had caught fire, Dean, Sr., went to Burnham’s place of business and asked for the return of the 1975 Ford pickup. He stated he had given the truck to his son as a present, and he wanted to know how Burnham had traded it without his authorization.
Cooper, the used car sales manager for Burnham, showed the draft to Dean, Sr., who informed Cooper the signature thereon was not his. This was the first time Burn-ham (with the possible exception of Hanne-mann) became aware that Marvin R. Dean, Sr., was not the same person as Buddy Dean.
After Dean, Sr.’s complaint, George Ryan, general manager of Burnham, got Hannemann and Cooper together and asked them if there was anything wrong with the way the deal was handled. They said no.
Following his first inquiry, Dean, Sr., began to cause Burnham difficulties, making complaints to them and about them, and apparently lodging criminal affidavits *1012 against some of the employees. There was a fistfight of some sort between Dean, Sr. and Cooper. A complaint was made to the Motor Vehicle Comptroller, and a hearing was scheduled at Burnham’s place of business.
Burnham, who was in bad health and not at the business fulltime, was at his place of business the day before the hearing. Burn-ham asked Hannemann, “Now, Mel, there’s nothing that we have to worry about? There’s no discrepancy in this deal in any kind of way?”
Hannemann then informed Burnham and Ryan for the first time, “Yea, Mr. Burn-ham, I signed the man’s name to the draft.”
Until this revelation Burnham had thought there was no merit to Dean, Sr.’s harassment, but following this admission, the company recognized it had legal problems and liability.
The record is not clear as to the first time Burnham notified Universal Underwriters of its problems. The record does reflect, however, that numerous telephone calls were made, and that there was correspondence from Burnham requesting assistance from Universal, including a “negotiator.” The invariable response from Universal was there was no coverage under its policy with Burnham. Except in receiving the telephone calls, and letters from Burnham, Universal made no investigation.
On October 8, 1977, Universal wrote Burnham acknowledging receipt of “report of accident” and declining coverage. The letter went on to state the reasons for the disclaimer were “the allegations set forth in the claimants letter dated June 1, 1977, do not allege a peril for which coverage can be afforded.” The letter further stated that in making the disclaimer, Universal did not intend to waive any other defense under the policy. The claimants’ letter referred to is not a part of the record.
Ryan replied by letter of October 7, acknowledging receipt of the October 3, letter and then stating:
It is, of course, necessary for us to inform you at this time that we do not agree with the premise set forth in your letter. We know that you do not have the facts you need yet. We are certain, after we present the facts to you in this writing, that Universal will have foreseen the situation occurring and would have afforded coverage of the peril within our dealership insurance coverage. Such is our faith in Universal and in their competency to insure dealership operations equitably that we feel most confident of your help.
Probably what we need most at this instance is one of your top-notch negotiators. We have seen you fellows in action through the years — in small claims, large claims; simple ones, complicated ones— witnessed it in the aftermath of the devastation and destruction of Camille — negotiation with swiftness and with heart. We need that kind of help now. This is no situation for us amateurs. We need a Pro.
We have divided the facts up in to eleven parts and five exhibits, which we attach to and make a part of this letter. The development of the real facts and the true picture have taken a long agonizing time. For a long time in this claim we proceeded blissfully unaware that the dealership had been compromised, and when one of the culprits confessed in writing — long after the fact was committed, we became urgently wide awake and cognizant of the perils in which we were involved. After examining the attachments, please let us hear from you further.
The information sent with this cover letter is not in the record, either.[1]
The Deans filed suit in the circuit court of Jackson County. Burnham filed a suit against the Deans in the chancery court of Jackson County, apparently seeking some sort of accounting of the Deans’ claims. The chancery court action resulted in a *1013 decree finding Burnham owed “the defendants” $9,486.90.[2]
Following rendition of this decree, Burn-ham paid Dean, Sr., $9,486.90.
Burnham had in effect with Universal a policy insuring Burnham, with $10,000 policy limits, against the following loss:
EMPLOYEE DISHONESTY COVERAGE-FORM A
I. Loss of Money, Securities and other property which the insured shall sustain to an amount not exceeding in the aggregate the amount stated in the Table of Limits of Liability applicable to this insuring Agreement I, through any fraudulent or dishonest act or acts committed by any of the Employees, acting alone or in collusion with others.
Burnham filed suit against Universal in the circuit court of Jackson County on December 1, 1978, under this policy alleging damages through the dishonesty of Hanne-mann and Cooper, and numerous occasions upon its part of reporting relevant information to Universal, and their refusal to compensate plaintiff. The declaration asked for $35,000 actual damages and $100,000 punitive damages.
At the trial Ryan testified of the previous excellent relationship with Universal over a period of years, but in this case repeated unsuccessful efforts to get Universal to investigate this case and assist them, and of correspondence. The chancery court decree was admitted as a part of the record, but the circuit court refused to permit the decree to be offered into evidence before the jury. The court did permit Ryan to testify he paid Dean, Sr., $9,486.90 following rendition of the chancery court decree.
Burnham and Ryan repeatedly characterized the act of Hannemann as a forgery, unauthorized, and done totally without their knowledge or authority. ■ Hannemann, no longer an employee of Burnham, was called as a witness for the plaintiff.
Hannemann acknowledged he signed the draft, stating Marvin R. Dean had told him to sign it and that he had later learned this was not Marvin R. Dean, Sr. However, on cross-examination he testified as follows:
Q. Allright. At the time ... at the time you received the authorization to sign the name on there, you thought the man who owned it was telling you to sign it, right?
A. Yes, sir.
Q. And you thought his name was Marvin R. Dean, Sr.?
A. Well, I knew ... I had been authorized by the boy, Buddy Dean, to sign it and I asked him how he wanted it signed. He said, “Marvin R. Dean, Sr.”
Q. And you thought he was Marvin R. Dean, Sr.?
A. No, he gave his name as “Buddy Dean”, but he told me to sign it “Marvin R. Dean, Sr.”
Q. You didn’t know anything about the father at this time?
A. No, sir, I never knew a thing about him.
When the plaintiff rested its ease, Universal made a motion for a directed verdict, which was over-ruled. Universal offered no testimony in defense.
When both sides rested, the court refused a requested peremptory instruction of the defendant, and granted a requested peremptory instruction in favor of Burnham. The court reasoned as follows:
Based on the testimony, it is undisputed at this time, one of the employees signed the name of the owner of the vehicle without that person’s authority, even though he did, at the time, think the person telling him to sign it was the person who was the owner; and, therefore, it resulted in a dishonest act . .. maybe for which he is not criminally responsible because we are not involved in a criminal matter at this time. But the net results of it is that it was, in fact, a *1014 dishonest act, even though the man that signed it may have thought the man giving him permission to do it had the authority to do so and it turned out he did not have that authority. So I think it’s clear that, from the evidence before the Court, that there was a dishonest act within the definitions of the policy.
Based upon his ruling set forth above, the circuit judge granted the plaintiff the following instruction.
The plaintiff has sustained actual damage as a result of the fraudulent or dishonest act or acts committed by the employees of the plaintiff, acting alone or in conjunction with others, and the plaintiff is entitled to a verdict in an amount which will reasonably compensate the plaintiff for its loss sustained as a proximate result of said employee’s act not to exceed $10,000 under the terms of the (word illegible) Contract.
There was a jury verdict in favor of Burnham for $10,000 actual damages and $35,000 punitive damages, and judgment in that amount rendered thereon, from which this appeal has been taken.
I.
Was there a jury issue on liability and damages?
We find the trial court was in error in finding as a matter of law the action of Hannemann was fraudulent or dishonest. It was for the jury to determine under proper instruction of the court whether the conduct of Hannemann was either dishonest or fraudulent. It is patent Hannemann had no legal right to sign the name of Marvin R. Dean, Sr. Whether it was dishonest or fraudulent, however, depends upon Hanne-mann’s state of mind, his intent to deceive or defraud, or what might reasonably have been inferred from his conduct. The evidence is sufficiently conflicting to have made a jury question to decide either that his act was or was not fraudulent or dishonest. See Anderson Dunham, Inc. v. Aiken, 241 Miss. 756, 133 So.2d 527 (1961); 27 C.J.S. Dishonesty.
The lienholder credit union submitted the original title to Burnham after the debt of $1,934.09 was paid. Thereafter, somebody other than Dean, Sr., signed his name to the title, thereby authorizing the motor vehicle commission to issue title to the 1975 Ford pickup to Burnham or a subsequent buyer. Mississippi Code Annotated §§ 63-21-31, 63-21-33. It was this act which was the heart of converting the vehicle to Burn-ham’s own use. The record is not clear as to whether Hannemann had any part whatsoever in this unauthorized assignment of the motor vehicle title, or whether Hanne-mann’s signing of Dean, Sr.’s name to the draft brought about or proximately caused the unauthorized signing of the motor vehicle title. Before being entitled to any damages, Burnham has the burden of proving the circumstances of the signing of this title, and the sufficient factual connection of Hannemann with this act to make a jury issue on this question.[3]
II.
What is the measure of damages?
Instruction P-5 is further defective in that it authorized the jury to pay plaintiff an amount “not to exceed $10,000.” First of all, the proof of actual damages was less than $10,000, and the instruction placed a higher ceiling than the damages actually sustained. Secondly, such an instruction is defective in suggesting an amount of actual damages. St. Louis San Francisco Railway Co. v. Dyson, 207 Miss. 639, 43 So.2d 95 (1949). We recognize that the purpose in giving the instruction was to *1015 inform the jury that, regardless of the amount of damages, the amount recoverable under the insurance policy was limited to $10,000. Had this been a case in which there was no question but that the amount of damages under the policy exceeded the policy limitations, it would have been proper to instruct the jury in the same instruction, that in no event could the amount of their verdict exceed the limitations of the policy. In a ease in which there is an issue of fact for the jury to determine whether or not the amount of damages exceeds the policy limitations, we believe the better procedure would be to cover the limits of the policy by a separate instruction, and instruct the jury that regardless of the amount of actual damages, the amount recoverable is limited to that stated in the policy. In a case as this, in which the proof of actual damages in no event reaches the policy limits, we see no reason in placing the ceiling figure fixed by the policy.
It was also error for the court to permit Burnham to offer into evidence the amount it paid Dean, Sr., without first proving that that was the amount it legally owed him. The amount of actual damages which Universal would owe Burnham, assuming payment was promptly made and there were no consequential damages because of a refusal to pay Dean, Sr.[4] is for the conversion of his Ford pickup because of a dishonest or fraudulent act of Burn-ham’s employee or employees, which was not known to or approved by Burnham. The measure of damages for conversion is the value of the property at the time and place of its conversion. Masonite Corp. v. Williamson, 404 So.2d 565 (Miss.1981).
We therefore reverse and remand this case for a new trial where it will be incumbent upon the plaintiff to prove, and for the jury to determine, upon proper instructions by the circuit judge:
(1) fraudulent or dishonest act or acts were committed by employees of the plaintiff covered by the policy;
(2) as a result thereof, plaintiff became legally obligated to pay Dean, Sr., damages; and
(3) the amount in damages plaintiff became legally obligated to pay Dean, Sr.
In view of this decision, we of necessity do not reach the propriety of giving an instruction on punitive damages. Upon retrial, this issue will be governed by our holding in Aetna Casualty and Surety Company v. Steele, 373 So.2d 797, 801 (Miss.1979):
The rule in Mississippi is settled that punitive damages are not recoverable for a breach of contract unless such breach is attended by intentional wrong, insult, abuse, or such gross negligence that amounts to an independent tort.
REVERSED AND REMANDED.
PATTERSON, C. J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, LEE and BOWLING, JJ., concur.
APPENDIX “A”
IN THE CHANCERY COURT OF JACKSON COUNTY, MISSISSIPPI
BOB BURNHAM PONTIAC-TOYOTA, INC. COMPLAINANT VS. NO. 33,470 MARVIN R. DEAN, ET AL DEFENDANTS
THIS CAUSE having come on for hearing on Bill of Complaint, Amendment to Bill of Complaint, and Answer to the Bill of Complaint, and the Court having taken ex *1016 tensive evidence, oral and documentary, and having heard and observed the witnesses, and being fully advised in the premises, does hereby FIND, DETERMINE, ADJUDICATE, ORDER AND DECREE as follows:
I.
All necessary and proper parties are before the Court.
II.
That the subject 1975 Ford pick-up truck was lawfully titled in the name of the defendant, Marvin R. Dean. That Mel Hanneman, an employee of Bob Burnham Pontiac Toyota, Inc., without authority, intentionally signed the name of the defendant, Marvin R. Dean, to a draft to cause the transaction complained of to be consummated and did put the transaction in process with knowledge that he had not requested or obtained a power of attorney from the said Marvin R. Dean to sign his name.
III.
That M. E. Cooper, another employee of Bob Burnham Pontiac-Toyota, Inc., approved the trade with the defendant, Marvin R. Dean, Jr., knowing that there was no valid power of attorney signed by the defendant, Marvin R. Dean, authorizing the transfer of title of the 1975 Ford and thereby induced the name of Marvin R. Dean to be signed by another employee of Bob Burnham Pontiac-Toyota, Inc., to the title to the 1975 Ford without lawful authority. That Complainant thereby voluntarily parted with title to and possession of the 1976 GMC and then voluntarily parted with title to and possession of the 1975 Ford, with the true facts of the transaction never having been disclosed to Complainant, and such withholding of information misled Complainant into believing the transaction was bona fide.
IV.
That by virtue of the sale of the 1976 GMC to the defendant, Marvin R. Dean, Jr., and the acceptance of his trade-in vehicle, a 1975 Ford, the Complainant’s employees, Mel Hanneman and M. E. Cooper, received a direct monetary gain from such sale, although such sale was then made without lawful authority for the reasons set forth hereinabove.
V.
That the executive officer of Complainant, including the President, Robert Bum-ham, was without knowledge of the circumstances set forth hereinabove until long after Complainant had parted with title to and possession of both the 1975 Ford and the 1976 GMC.
VI.
That although the defendant Marvin R. Dean complained to Complainant that he had not signed the title and he demanded rescission of the transaction, the true facts, though requested, were not disclosed to Complainant by its employees, Mel Hanne-man and M. E. Cooper, until much later and after the defendants had sustained substantial loss, expense, inconvenience and delay.
VII.
The Complainant has sustained the allegations of the original Bill of Complaint, and the defendants have placed in evidence an accounting of the losses and damages which they have sustained.
VIII.
The defendants are hereby awarded judgment against the Complainant for the sum of $9,486.90 as damages sustained by said defendants as a result of the actions set forth in Paragraphs II and III hereinabove.
SO ORDERED, ADJUDGED AND DECREED, this the 20th day of July, 1978.
Vs/ Kenneth B. Robertson CHANCELLOR
Approved:
Marvin R. Dean, Sr.
Glenn Barlow
Atty. for Marvin R. Dean, Sr.
and Buddy Dean

. This record has presented the Court with some difficulty. It appears critical information has been omitted, and many facts are revealed only by offhand references of witnesses.

. See Appendix “A” for the full text of the final decree of this mysterious lawsuit in which there obviously was more than one defendant, but which specifically names only Marvin R. Dean.

. It is not clear from this record just how Dean, Sr.’s name got on the title. Apparently, the usual business practice of Burnham was to procure a power of attorney from the buyer authorizing Burnham to sign the buyer’s name to the motor vehicle title assigning the title and transferring ownership of the vehicle taken on a trade-in. Dean, Sr., manifestly gave no such power of attorney, but somebody connected with Burnham signed his name assigning the motor vehicle title, anyway. Hannemann’s connection with this act, if any, is not shown in the record.

. Appleman, Insurance Law and Practice, § 6357, states, “... unless otherwise stipulated, the bond should be construed as a covenant to pay the damages actually suffered.” See also Wyler v. Schindler, 267 App.Div. 380, 46 N.Y.S.2d 390 (1st Dept. 1944), aff’d 293 N.Y. 685, 56 N.E.2d 297.